RUFUS HODGES *v.* MRS. BETTY Jo HODGES ET AL

5-4369                                    424 S. W. 2d 174

Opinion delivered February 19, 1968

*N. M. Norton,* for appellant.

*Mann & McCulloch,* for appellee.

CARLETON HARRIS, Chief Justice. This litigation relates to a suit brought by Rufus Hodges, appellant, seeking specific performance of a contract, wherein Edd Hodges had allegedly agreed to leave appellant certain property by will. Edd Hodges died on April 21, 1964, a resident of St. Francis County, leaving a widow, but no descendants. The widow was appointed executrix, but evidently declined to serve, and the First National Bank of Eastern Arkansas was appointed administrator with the will annexed. In January, 1965, Rufus Hodges instituted a suit in the St. Francis Chancery Court, in which he alleged, *inter alia,* that, upon retiring from

naval service, he had returned to Forrest City at the behest of Edd Hodges (according to appellant, a distant relative). Hodges, it was alleged, in consideration of appellant's working on his farm, had agreed to make a will, leaving to appellant farms known as the Noah Hodges place, the Powell place, and the George Pugh place, together with one-third of Edd's stock in the Yocona gin. Edd Hodges did devise to Rufus the Maggie Powell place, consisting of 160 acres, but the other properties, together with all stock in the Yocona gin, were left to the widow, Betty Jo Hodges. Mrs. Hodges answered, denying the allegations, and subsequently the bank intervened as to the personal property. On trial, the court held that Rufus Hodges had not established the existence of the alleged contract by evidence that was clear, satisfactory, and convincing, and the complaint was dismissed. From the decree so entered, appellant brings this appeal. It is asserted that the court erred in ruling that evidence of the contract between the two Hodgeses fell short of the standard of proof required.

Appellant testified that, in 1953, while he was serving with the Navy, he had some conversations with Edd, who suggested that when it was time for Rufus to get out of the Navy, he should contact Edd; in compliance with this request, Rufus called thirty days before his discharge date, and told Edd that he had an opportunity for a Civil Service job, but the latter told him to come on back to St. Francis County: "We can work out something." Upon discharge, on February 1, 1957, appellant returned to Forrest City with his wife and children, arriving on February 4. The witness said that Edd wanted him to take over some of his farming operations, but told him that the house he was to live in was then being occupied by a man named Kelly, and that as soon as he could get Kelly out of the house, the Rufus Hodges family could move in.

There was no agreement as to whether appellant would be an employee, a renter, a partner, or what par-

ticular status Rufus would occupy, but Edd said that they would get it "worked out." According to the witness, the owner stated that it would be about six months before the house would be ready for Rufus, and appellant's duties were due to start when he moved into the house. Thereafter, Rufus went to work for the Forrest City Machine Works, where he was employed for six months, and he then was employed by Yale and Towne for fourteen months. Rufus finally moved to the Hodges farm on October 4, 1958.

Appellant testified that there had never been any definite arrangements between the parties until August, 1958, when Edd stated that he would start Rufus at a salary of $250.00 per month, furnish a truck and expenses, and fix up the house in a manner that would be satisfactory to Rufus. Appellant said that he paid $1,100.00 of the house repair expense, moved in on the October date, and was told that he would go on the payroll around March 1. In the meantime, appellant resumed his employment at Yale and Towne until that time. At the end of his first month's employment with Edd, Rufus was given a check for $150.00, instead of $250.00, and he talked to Edd about it. The latter, said appellant, advised that if Rufus wanted to work, he (Edd) would "make it up," and then stated he would leave to Rufus the Noah Hodges place, which contained about 1,000 acres. Rufus was to mainly work with the cattle.

According to appellant, this arrangement lasted for about two years, and he then entered into a lease agreement. This agreement reflects that Rufus had leased 532 acres of farm land from Edd for a period of three years, commencing January 1, 1959; however, instead of three years, the lease recites that it shall last until 1966, the figure, "66," having obviously been altered from some other date. The instrument reveals that Edd was to receive one-fourth of the crop as rent; further, there appears in handwriting, in the body of the lease, these words:

"Rufus Hodges has two Ford Tractors, one 900, one 800, and one J. D. 60 with planter, disc, breaking plow, and two trailers. When his half interest in 60 head of cattle sold, Half will go for tractors. Will take care of them in full. E. H."

Rufus had testified that he "bought into the herd" of cattle, paying $1,000.00 for his interest in same. He stated that he was not given a receipt; that Edd said, "You don't need to have a receipt. You got my word. Don't I always stand behind my word?" He also testified that he owned some of the farm machinery; further, that he never received any settlement whatever on the 1959 crop, which was a good one; when asking for a settlement from Edd, he would always be put off. Likewise, he stated that he never received any settlement for the 1960 crop, but was told by Edd that that money would apply on Rufus' purchase of equipment. Appellant contended that he had already paid for the equipment. Edd then stated, "You're going to get that place down there. You got where you worry too much about stuff lately. Let me worry." The "place," according to appellant, was the Noah Hodges place, containing 732 acres of land, which also included two other farms, known as the Emmett Powell place and Fisher place: "He told me, 'You stay on until the end of this thing and you're going to get this place right here.' I said, 'Can I depend on that?' He said, 'You got my word.'"

Rufus stated that he did not receive any settlement for the 1961 and 1962 crops, which also were being farmed on the share basis, but Edd would always refer to the fact that he was leaving the place to Rufus. The witness stated that in 1963 he was told by Edd that, if appellant would work at the gin, Edd would give him one-third of the gin stock. The testimony was very lengthy, and other matters will be subsequently mentioned; however, the above testimony is sufficient to explain the basis of the contention by appellant that there was a contract between him and Edd to the effect that

the latter would leave the several farms and one-third of the stock to him.

Appellant then offered several witnesses on his behalf. Witness Barney Carlton and C. D. Simmons added nothing to the proof, the former testifying that Rufus was injured while working at Yale and Towne, and the latter stating that he had never heard Edd Hodges say anything about what he intended to do with the Noah Hodges place. Ralph Dye testified that Edd told him that Rufus was a hard worker, and that he was going to see that Rufus was taken care of; that Rufus would not lose anything by repairs being made on the house, stating to Mrs. Rufus Hodges, "When I'm gone you can do what you want with it." He said he did not recall ever hearing Edd say that he intended to leave the Noah Hodges place to Rufus. Richard Hodges, a brother of appellant, stated that Edd told him in 1957, "Maybe some day Rufus will own this place," and several times said, "Well, we'll clear this land. Maybe Rufus will still wind up with it." Henry Birmingham testified that Edd told him that he had willed Rufus the George Pugh place and the Noah Hodges place. Rob Simmons, a former employee of Edd Hodges, testified that about two years before Edd died, he told the witness that he would leave the place to Rufus.

Mrs. Marie Swan, secretary to present counsel for appellant, testified that, in the office, there was a retired file, called "Hodges will." She stated that in this file there was a draft of a will which had been prepared by Mr. Norton, and memoranda relating to changes to be made in this will. These memoranda were dated January 17, 1959, January 24, 1959, February 12, 1959, and March 7, 1959. The memoranda were then offered in evidence, same reflecting that Rufus Hodges was to be left the Noah Hodges place (except the northeast quarter of the northwest quarter of Section 30), the Emmett Powell place, the Fisher place, and one-third of Edd's stock in the Yocona gin. There was then introduced a

copy of a will dated March 7, 1959, under the terms of which Rufus Hodges was devised the properties mentioned in the memoranda, and also one-third of the gin stock. The copy indicates that the will was witnessed by three persons, and a note reflects that the original had been taken by Edd Hodges. This testimony was objected to by defendants, and the court, though expressing doubt whether the evidence was admissible in view of the attorney-client relationship, admitted same.

Appellee argues that the testimony of Rufus Hodges was not admissible, since it violates the "dead man's statute," (Section 2 of Schedule, Arkansas Constitution); however, we agree with appellant that the First National Bank of Eastern Arkansas, administrator, was not a necessary[1] party, and we, accordingly, hold the testimony of Rufus to be admissible. Likewise, as mentioned, the testimony of Mrs. Marie Swan was objected to, but there is no need in discussing whether this evidence was admissible, for when we consider the testimony of appellant, the evidence offered by his witnesses, including Mrs. Swan, and the exhibits offered into evidence, *i. e., all* of his evidence, we still are unable to find that Rufus Hodges established the oral agreement (s), upon which he relies, by clear, cogent and decisive evidence. In *Taylor* v. *Milam,* 219 Ark. 592, 243 S. W. 2d 644, a suit filed to enforce specific performance of an oral contract to devise land, it being alleged that Milam had made such an agreement in consideration of appellant's taking care of him, this court said:

"The rule has been many times announced by this court that, in order to establish title to and ownership of land on an oral contract, the burden is on the person seeking to establish the contract to show execution thereof by a higher degree of proof than a mere preponderance of the testimony. To establish such a contract the

---

[1] Actually, the bank filed its final settlement, and was discharged as administrator on May 18, 1967.

evidence of its execution must be clear, cogent and decisive. It must be so strong as to be substantially beyond a reasonable doubt. *Tucker* v. *Peacock,* 216 Ark. 598, 227 S. W. 2d 929.''

Numerous other Arkansas cases are to the same effect. Without any hesitancy whatsoever, we very quickly hold that appellant's proof in the instant litigation does not comply with that standard.

It is really difficult to understand exactly what appellant asserts as the precise contract. As to the real estate, there are several versions of what Edd purportedly promised to convey. The complaint alleges that he promised to convey the Noah Hodges place, consisting of 407.18 acres, the Maggie Powell place containing 160 acres, and the George Pugh place, containing 169.7 acres. However, on trial, Rufus testified that the Noah Hodges place contained 732 acres, and consisted of the Noah Hodges place proper, the Emmett Powell place (167.79 acres), and the Fisher place (86 acres). He stated that the George Pugh place was the 160 acres north of the Noah Hodges place. At another time, appellant testified that Edd Hodges, while standing at the corner where John Devasier lives, promised to leave him ''everything north and west from this corner.'' The location of the corner was later established by other testimony, and according to appellee's evidence, would include the following lands: Noah Hodges place (less 40 acres), Fisher place, Emmett Powell place, George Pugh place, and Maggie Powell place. Appellant, in his reply brief, admits that it is not entirely clear from the evidence as to what tracts of land constituted the ''Noah Hodges place,'' and it is also admitted that the copy of will offered in evidence did not entirely corroborate appellant's testimony. However, it is insisted that the evidence as to the agreement to devise the Noah Hodges place proper, is entirely clear and convincing. Here again, we do not agree.

Rufus testified that he returned to Forrest City at the urging of Edd for the purpose of entering into a working agreement; yet, it seems strange that Rufus, upon returning to that city (a number of his and his wife's relatives living in the vicinity) purchased a farm (which was later traded for equity in a house), and worked for other concerns for over a year and a half before moving to the Hodges farm. He testified that his compensation was cut from $250.00 to $150.00 the very first month, and subsequently stated that he never received any part of his share of the crop money for 1959, 1960, 1961 and 1962. It is not reasonable for one to forego payment for several years' work purely on the basis of a promise from someone, who had (according to appellant) already violated earlier agreements. The same is true with reference to the farm machinery. Rufus testified that he had paid for it, but that Edd contended that he had not. This, in itself, would normally have occasioned litigation. Appellant, in large measure, depends upon the handwritten provision in the lease to establish his interest in the farm machinery and cattle. One gains the impression from the evidence, that the principal reason for entering into the lease was to enable Rufus to acquire benefits paid by the government under the GI farm training program. To qualify for this program, the veteran had to either rent, or own, a farm, and he also had to make arrangements to obtain equipment. The program lasted for three years, during which time the veteran would attend school two hours per week, and Rufus was eligible for benefits commencing at $130.00 per month, the amount being successively smaller each month until the final payment of $44.29 was paid for the last month (total of thirty-six months).

Evidence was offered by the decedent's bookkeeper, Banks Wilkinson, that he could find no entries showing Rufus Hodges as a tenant; that Rufus never had a rent account; that the cattle sale by Edd Hodges in 1958 did not involve Rufus, and the bookkeeper stated that he had never seen a settlement sheet for appellant. Wilkin-

son also stated that the handwriting did not appear to be that of Edd Hodges; he testified that he did not recall Edd's ever using the initials, ''E. H.''

Rufus Hodges stated that he borrowed $1,000.00 from his brother-in-law, who lived in the state of Washington, for the purpose of purchasing the interest in the cattle owned by Edd Hodges. The loan was corroborated, but not the purpose of it. None of the witnesses offered by appellant testified relative to any claim of ownership by Rufus of the cattle, tractors, farm equipment, or gin stock.

Not a single witness corroborates the alleged fact that Edd had said that he was leaving, or would leave, any property to Rufus, *because of an agreement entered into between them.* Henry Birmingham testified that Edd had told him that he had left to Rufus the George Pugh place and Noah Hodges place, and Rob Simmons testified that Edd had told him that he would leave the Noah Hodges place to Rufus. The testimony of the other witnesses offered by appellant does not even come close to going as far as these two. Of course, there is quite a distinction between property that is devised as a gift —and property devised by reason of contract. Actually, Edd did devise to appellant a 160-acre farm (Maggie Powell place), which, according to appellant's own testimony, was rather valuable property. When asked what he would ''take for it,'' Rufus replied, ''$100-thousand. That is what it would take to get it.''

As pointed out in *Taylor* v. *Milam, supra,* the burden on the person seeking to establish title to land on an oral contract is one that requires a higher degree of proof than a mere preponderance of the evidence.

We are unable to find that appellant has established any oral contract for the devise of any farm by evidence that is clear, cogent, and decisive, *i. e.,* evidence so strong as to establish his contention substantially beyond a reasonable doubt.

Affirmed.